The opinion of the Court was delivered by
Bat, J.
This case was very ably argued by the counsel on both sides, and a great number of authorities were produced upon the occasion. I have since considered the arguments, and reviewed the authorities adduced, and am most clearly of opinion, that the decision of the Recorder was a correct and legal one. I shall briefly give my reasons for this opinion, and quote the principal authorities on which I rely in favor of it.
At the threshold of this case, it is important to consider the nature and object of our Statute of Limitations. It appears to me, that the grand object of our Limitation Act, and indeed the object of similar Acts in all countries where they exist, was to prevent old long-standing and antiquated demands, from being raked up and brought forward against men after such a lapse of time, as it was reasonable to suppose all transactions had been finally settled between the parties. By the common law, there was no limitations of actions of any kind. But in England, by degrees, divers Acts of Parliament were passed at different periods in the history of that country, for fixing and determining the time *4.991 w^lum which all actions, real and personal, were to *be com-J menced or instituted. But one universal principle seems to pervade or run through the whole of them, namely, to prevent ancient claims from being set up and prosecuted after the original parties and all their witnesses were dead, or removed into remote parts, beyond the reach of the Courts of justice, or that their deeds and vouchers were lost or mislaid by time or accident, and particularly in money transactions, where it was fair to presume the debts had been paid or satisfied. It was for these reasons, and to quiet men in the enjoyment of their estates and possessions, that these restrictive Acts have been enacted, and more especially that our Limitation Act was passed. But it never could have been intended to prevent a man who had never been guilty of any wilful laches or delay ; but who had been prevented, by inevitable necessity, from pursuing his just rights.
Having taken this concise view of the origin of our Limitation Act, I shall next proceed to consider what these causes or events are, which prevent a man from pursuing his legal remedy, and which appear to me to form exceptions to the operations of these Acts, and indeed of all municipal laws and regulations whatever. And these I take to be two : 1. The act of God. 2. Enemies in war.
The act of God, to which the destinies of man must submit, and over which human laws can have no control, then forms the first grand exception to the operation of all Legislative Acts, and is so broad and extensive in itself as to include within the range of its operations, all the storms, tempests, earthquakes, and other casualties of nature. Whenever they happen they form marked exceptions to all human institutions. If a master of a ship, who is bound by law to carry and deliver goods in *673 safety, is overtaken by a storm or tempest at sea, is obliged to throw over a part of the cargo to save his own life, and the lives of others on board, this will exempt him from any responsibility for damages to the owner. So, if a common earner, who is bound to carry goo'ds safely at all events, is, in like manner, overtaken *by a storm or tempest, whereby the r*,rnn goods are lost, it shall excuse him. So, if a house be destroyed L ”” by fire in the course of a dreadful conflagration occasioned by lightning, or by an earthquake, which a tenant is bound to keep in repair and to deliver up in good order; this shall release him from his covenant. I only mention these few instances, as illustrative of the subject under consideration ; and which I find confirmed by the best common law writers and authorities. In Plowden, which was quoted in the argument, this doctrine is very fully laid down and illustrated. In page 9, he says, “ In our law, as well as in all other laws, there are some things that happen which cannot be prevented by any foresight or possible diligence, or avoided by any means whatever; and when any such thing happens to a man, the law will not punish him for it; for the law will not punish a man but for his own default, and if the law. sees no default in him, it will not punish him; for, if the law should punish a man for an accident, which, by no foresight or diligence, could possibly be avoided, it would be utterly against reason, and therefore seeing that such accidents can by no means be avoided, the person upon whom they happen shall not be hurt or injured thereby.” This very able and excellent commentator then goes on and adds, “■ there are three kinds of laws by which the people are governed, viz., the general law, customs, and statute law, and in these three laws such unavoidable accidents shall not hurt any one,” for which reason, he says, “ though the effusion of blood, and killing a man, is prohibited by the common law, yet every man may kill another in his own defence.” “ So, by the common custom of the realm, as hosts shall be charged for the goods of their guests, lost or stolen, yet, if their houses be broken by the king’s enemies, and the goods be taken from thence, they shall not be chargeable for them, by reason, that such violence cannot be resisted, and so like reason will dispense with the statute law, and this from the necessity of the matter.” Plowden then instances the case of a ship on fire, storms and ^tempests at sea, and throwing goods overboard to save the lives of passengers, and which I L have before observed upon. All these instances, and many more which might be examined and enumerated, will excuse or prevent the ordinary operation, both of the common and statute law, whenever they happen, and may be considered as forming exceptions out of the general principles of all laws, as Plowden very fully and justly observes. If I was to search volumes, I could find nothing more conclusive on the subject, than the reasoning of this wise and able old common law commentator; and there is nothing in modern writers to contradict him, but .on the contrary, they all bow down to and respect him.
Secondly, enemies in war. Under the foregoing head, I have considered the exceptions to the operations of municipal laws by the act of God. I now proceed to consider the second general exemption from the casualties of war. Vattel lays it down, in Lib. 3, chap. 1, sec. 1, p. 26?, that “ war is that state in which a nation prosecutes its rights by force of arms.” In sec. 4, p. 439, he lays it down, that private individuals have *674 no hand in the declaration. “ A right so dangerous and important, can only be entrusted to the supreme authority of the country alone.” It is, therefore, one of those events or casualties which individuals cannot prevent, and over which they can have no more control than they can have over the elements we have just been considering. He then proceeds, “ formerly, wars were carried on with great rigor, and everything found in the country belonging to an enemy, or the subjects of an enemy, was confiscated to the State ; even debts due from the subjects of a State at war, to those opposed in war, were confiscated also, but, at present, they are carried on with more moderation and indulgence, especially since the introduction of commerce among the European nations, and consequently, all the sovereign nations of Europe have departed from this rigor ; and as this custom has been generally received, he who should now act contrary to it, would injure the *p;n9n *PUW’C faith;” for, he adds, “strangers trusted his subjects only from the firm persuasion, that this general custom would be observed. States do not as much so touch the sum which it owes the enemy. Everywhere, in case of war, funds credited to the public are exempted from confiscation and seizure.” Yattel, Lib. 3, chap. 5, sec. 16, if, p. 298. So far with regard to the law of nations. Corresponding with these principles of national law, Lord Coke lays it down as a part of the common law, that there is a distinction between an alien friend and an alien enemy. That an alien enemy shall not maintain either real or personal actions, until both nations are at peace; but an alien friend at peace may maintain personal actions; for an alien friend may trade and traffic, buy and sell, and therefore, of necessity, he must be of ability to have and support personal actions, but he cannot maintain real actions, as he cannot hold lands. Co. Lit. sec. 198, p. 129. Again, when the Courts of justice are open, and the judges and ministers of the same may, by law, protect men from wrong and violence, and distribute justice to all, it is time of peace ; but when by invasion, insurrection, rebellion, or the like, the peaceable course of justice is disturbed, or stopped up, so that the Courts of justice are shut, “ et silent legis inter arma,” then it is a time of war. Co. Litt. sec. 412, p. 249. So careful, therefore, is the law of the rights of men, that if a man be disseized in time of peace, and the descent is cast in time of war, this shall not take away the right of entry of the disseisee. Co. Litt. 412. From the foregoing principles, laid down by Lord CoKE,itap-pears, that the common lawrecognizes the civil law, and they botlrcoincide and harmonize upon this important subject, namely, that in time of war no action can be maintained by an alien enemy : but upon the return of peace, all the friendly relations between the subjects and citizens of the two countries are restored, and their rights may be mutually prosecuted in the Courts of justice in either country, respectively, without hindrance or in-*6(131 terruption. And the reason given for *not permitting an alien enemy in time of war, is a good one, as it might have a tendency to draw the resources out of the country, and the better enable or aid the opposite party to carry on the war on his part.' War, then, does not deprive the individual, in an enemy’s country, of his right or demand; it only suspends it until the Courts of justice are open to enable him to recover it. The .privilege of commerce has secured this right to the subjects of all nations; and the State which should refuse this right at the present day would not deserve to be ranked among those of the civilized *675 world. Upon the return, therefore, of the day of peace, all those rights recommence which had lain dormant, or had been suspended during the period of war. A contrary doctrine would enable every debtor, in a country lately restored to peace, where there had been commercial dealings before the war, to cheat and defraud his just and bona fide creditors, as was very well observed in the argument, since every nation in its political capacity disdains or disclaims every idea of confiscating commercial debts to its own use. If, then, it is clear and evident, both by the common law and the law or courtesy of nations, that there is no national principle existing to bar or prevent an alien in a foreign country from recovering a just debt after the restoration of peace, shall it be said or allowed, that any municipal regulation of one of the States shall have that effect, where the general law of nations and those of foreign commerce say the contrary ? I very much question the power or authority of any State or nation, at this enlightened period of the world, to pass such a law, if they were disposed to do such an act of injustice. "
But it is said our statute of limitations will have that effect, which brings me to consider, thirdly, the nature and operation of that Act. I have already given my ideas of the general nature and design of the statutes of limitations wherever they have prevailed. I shall now confine myself more particularly to our Limitation Act of lí 12, 2 Brev. Dig. 21.[1] And here I would observe, that I consider it as a mere municipal regulation,* r*gg^ founded on local policy, which can have no force or bearing abroad, *- and with which foreign or independent governments have no concern. But it has been contended, that when it once begins to run, it must run on, notwithstanding any subsequent disability, till it runs out, and this, too, as well against foreigners, as our own citizens, and as well during war, as in peace. I admit that it is, in general, a good rule, but to every general rule there are exceptions arising from necessity or causes beyond the reach or control of municipal regulations. The intent and meaning of the above general rule, when confined to its true and proper limits, I take to be this. As every general rule ought to be founded on right and reason, that where the laws of the country afford a redress for every injury, and recovery of every just right, and the Courts of justice are open to administer redress, the party entitled to a remedy, or to a just demand, who will not pursue it within the times mentioned in the Act, and use that diligence which the law requires of him for the recovery of it, in such cases, the statute once beginning to run, shall run on until the party is barred of the right or remedy, and any other construction of the rule, would, in my opinion, be subversive of every principle of justice. For it surely will never be contended that municipal regulations, or local statutes can control the destinies of nations, or deprive citizens of a belligerent of rights they were entitled to before the declaration of war. Is it not more consistent with reason and justice, that such rights should remain suspended, till the storm of war shall end, and peace once more smile upon, and bless contending nations ? No rational mind can refuse its assent to the affirmative of this proposition. War, it is admitted on all sides, cuts off all friendly intercourse between the citizens and subjects of contending nations, and shuts up the Courts of justice against the demands *676 of each other, however numerous and great the credits or creditors maybe. It is an event that the creditors could not control, and over which *5051 ^ey no Power- There is no default *in them. It is one of J those things which Plowden says could not be avoided by foresight or diligence ; and when such things happen, the law will not punish a man for it; for if the law should punish a man for an accident, or for an event, which by no foresight or diligence could be avoided, it would be utterly against reason, Now to apply these principles, and the force of this reasoning, to the case immediately under consideration, the law of nations not only permits, but favors foreign commerce; and the courtesy of nations permits and allows contracts for merchandise; and as a natural consequence, the right of recovering debts. Por example, a man in South Carolina, contracts a debt with a merchant in- England, and imports his merchandise in good order, and in due time, agreeably to order. Within one month after this contract is made, war is declared between Great Britian and America, and lasts, we will suppose, for five years, the time mentioned in the Act; at the end of these five years, peace, is restored, and the merchant in England calls upon his debtor in South Carolina for his money; no, says the debtor, we have a statute in force in South Carolina, which says all debts not sued for within five years shall be forever barred ; that this statute began to run when the contract for the goods was made, and it ran out, which operates as a bar to your recovery. But, replies the English merchant, I was prevented from bringing suit, as war was declared immediately after the contract was made, and I brought my action as soon as possible after the war ended, and peace was restored. No matter for that, rejoins the Carolina debtor, our Statute of Limitations began to run from the day of the contract, and nothing could stop it till it ran out. So your debt is gone forever. Would this be justice? Would it not be punishing an innocent man for an event he could not foresee, and which no diligence on his part could prevent ? Would it not, lastly, as Plowden says, be utterly against reason ? Most undoubtedly it would. What, then, I would ash, becomes the duty of the judges in such a dilemma? Are they to *50n *Pve t'kis Act su°h a construction as to enable the debtor to cheat his honest and bona fide creditor out of his money ? I trust not. It, therefore, in my opinion, becomes the duty of the judges of our Courts of justice to give the Act a reasonable and equitable construction, such as is consistent with reason and justice. And to that end, the best general rule in construing statutes, is the one laid down by Plowden, 461, in which he says, in order to form a correct judgment, whether a case be within the equity and intent of the statute, “ It is a good way to suppose the law maker present, and that you asked him this question : Did you intend to comprehend this case within the statute ? Then give yourself such an answer as you imagine, he being an upright and reasonable man, would have given. If this be, that he did mean to comprehend the case within it, then you may safely give it such a construction. But if, on the contrary, that he did not think it within the equity and intent of the statute, then act in conformity to it.” Plowden still goes on and adds, “in some eases the letter of an Act of Parliament is restrained by an equitable construction; in others, it is enlarged by it, and in others, again, it is even contrary to the letter of the statute,” *677 which shows the latitude, the sages of the law have, at different times, taken in construing statutes, in order to make them equitable and reasonable. For fear it should be said I am straining this doctrine too far, I will quote another passage or two- from Plowden, and I am sure I cannot rely upon a higher authority. “ Experience shows,” says this great and profound lawyer, “ that no law makers can foresee all things which may happen, and therefore it is fit, that if there be any defect in the law, it should be reformed by equity, which is no part of the law, but a moral virtue, which corrects the law from whence he concludes, “ that the reader may observe how convenient a thing this equity is; and the wise judges of our law deserve great credit and commendation for having made use of it, where the words of the law are rigorous; for thereby they have softened the *severity of the text, and made the law tolerable.” Plowd. 461. In 1 Inst. 360, it is laid down as a maxim, that a ^ statute should be so construed, that no man, who is innocent, should be punished by it, or endamaged. So, in Carthew, 136, it is said, that no statute shall be construed in such a manner as to be inconvenient or against reason. Now to apply these rules of construction to our statute of limitation, which, by-the-by, was passed more than a century ago, when the rights of commerce, as well as the law of nations, were not generally well understood in Carolina, and when it was a colony to Great Britain ; and when it could not possibly have been supposed that this then colony, should ever become an independent State, or that the merchants of Great Britain should ever be considered as aliens in this country, can any man, I say, bring himself to believe, that the colonial Legislature of South Carolina, at that day, say 1712, (108 years ago,) could possibly have had it in contemplation to have regulated the nature of actions between foreign merchants and the citizens of South Carolina, as an inedpendent State, or that they should have intended to fix and ascertain the time or period for bringing suits for the recovery of debts from each other ? "Utterly impossible ! The idea is too romantic to be indulged for a single moment. But to go one step further, and the more immediately to apply Plowden’s rule ; suppose, for a moment, it were possible to call up the members of the Legislature of 1712, from their slumbers in the tomb, and that they were present, and asked Plowden’s question, Did yon intend that the statute of limitations, you have just passed, should bar foreign merchants of their actions for just debts, where they have been prevented by war from bringing suits for the recovery of them ? I presume there is no man who hears the question asked, would. hesitate a moment in concluding that the answer would be una voce, We had no such intention. It was only designed as a municipal regulation among the inhabitants of this province, at the time, and never was intended to bar the ^rights of foreign creditors from the recovery of riPi(18 their debts.
But granting the utmost that was contended for, that it was intended to bar foreigners, as well as citizens, after the limited time mentioned in the Act, from maintaining suits at law, will not the declaration of war suspend the operation of the Act ? especially, as it was an event that the Legislature of 1712 could not have foreseen or guarded against, or, indeed, if it could have been foreseen, it did not lay with a colonial Legislature to have regulated commerce or commercial rights; that was a *678 subject for the consideration of parliament, the supreme Legislature of the empire. We have already determined that one of the clauses in the executor’s law of 1189, suspended the operation of the Limitation Act; as it prevented a man from suing an executor until after the expiration of nine months from the death of the testator, although there are no express words in the executor’s law to that effect. Now there is no doubt in my mind, but that the Act of Congress of June, 1812, which is the supreme law of the land, declaring war against Great Britain, is perfectly analogous to the executor’s law in this respect; for, by its operation, it prevented British subjects from suing during the war, and consequently was as much a suspension of the Limitation Act as express words could have made it y for, by the act of war, our Courts of justice were shut up against British creditors, as effectually as they were during the nine months by the executor’s law against our own citizens. So covenants are repealed or extinguished by Acts of Parliament, as where A covenants not to do any thing, which it was lawful to do, and an Act of Parliament comes after, and compels him to do it, the statute repeals the covenant. So, if A covenants to do a thing which is lawful, and an Act of Parliament comes and hinders him from doing it, it in like manner repeals the covenant. Brewster v. Kitchell, Salk. 198, 5 Co. 7. 2 Bac. 80. Now it is evident, that privilege allowed to aliens to bring suits for recovery of debts, amounts to a covenant on the part of the State, *5091 it shall be lawful for them so to do. And the language of -J the limitation Act is, that they shall do so within five years. But if an Act of Congress, which is a paramount Act, comes in and says, they shall not maiutain any suit during time of war, which the declaration of war proclaims to the world, surely this amounts to a repeal or suspension of the Limitation Act, which calls upon them to bring suit within five years, as long as the war lasts, as effectually as an Act of Parliament repels or suspends a covenant solemnly made and entered into under the hand and seal of the party. To give it any other construction, would be the extreme of injustice ; contrary to all the principles of reason and equity laid down by Plowden, Lord Coke, and the other authorities quoted. But by giving this construction to the Act, the rigor and severity of the text of the law is softened ; it is reconciled to reason and justice, and the rights of innocent individuals abroad, who reposed faith in the laws of our country, are preserved and protected by it. Courts of equity have likewise given this reasonable construction to the Act of Limitations; for it has been determined, that if the statute of limitations attaches upon a demand pending a suit in equity, the Court would take care to preserve the plaintiff’s right, and would not suffer the statute of limitations to be pleaded against the demand in a Court of law. Far-rington v. Chute, 1 Yern. 14. So likewise it has been held, that if there be no laches on the part of the plaintiff, he shall not be barred by the statute of limitations, as where there is no executor against whom a suit could be brought after the death of the testator, the party shall not be barred, provided the suit is brought in due time afterwards. Joliffe v. Pitt, et al., 2 Vern. 695. Webster v. Webster, 10 Vern. 93. Now, in the present case, no laches can be imputed to the plaintiff, as during the war he could not maintain his suit, but as soon as peace was restored, the action was commenced.
*679 In the course of the argument, it was mentioned, that a case had been tried before Mr. Justice Johnson, *in the federal Court, similar r-*KiA to the one under cousidei’ation ; and that he had decided, that the ■- statute of limitations would not run against a British creditor during the war. I have since asked the judge for his notes of the case, when he informed me he had made such a decision, in a case in which John Haslett was a party, and he wished the point to be carried up to the Supreme Court, but the parties afterwards acquiesced in his decision. It may, however, be considered as a nisi prius case, and is directly in point. Prom every view, therefore, which I have been able to take of this new and important subject, and from all the authorities which I have been able to examine, which have a bearing upon it, I am decidedly of opinion that the declaration of war amounted to a suspension of the Limitation Act, against British creditors, and that the whole of the time which elapsed from its declaration, to the day when peace was proclaimed, ought to be thrown out of the computation of time mentioned in the statute for barring a plaintiff of a just demand ; and, consequently, that the Recorder’s decision in the City Court of Charleston, ought to be affirmed; and that.the postea should be delivered to the plaintiff to enter up his final judgment thereon.
Colcock, Johnson and HugeR, JJ., concurred.
Recognized and applied in the Jew’s land cases, Abbeville, which succeeded the case of Duncan v. Beard, ante, 400. See 3 McC. 457.

 2 Stat. 683.